# Exhibit 3

# Part 3 of 3

# EXHIBIT G

# Thomas E. Herrmann
Senior Vice President
Strategic Management Services, LLC
5911 Kingstowne Village Parkway
Alexandria, VA 22315

## Professional Experience

- January 2009 - Present: Senior Vice President, Strategic Management Services, LLC

- August 2002 - December 2008: Administrative Appeals Judge, Medicare Appeals Council, U.S. Department of Health and Human Services (DHHS), Washington D.C.

- October 2000 - July 2002: Special Counsel for Legal Policy, Office of Counsel to the Inspector General, Office of Inspector General (OIG), DHHS, Washington D.C.

- October 1990 - October 2000: Chief, Administrative Litigation Branch, Office of Counsel to the Inspector General, OIG, DHHS, Washington D.C.

- October 1982 - October 1990: Trial Attorney, Office of the General Counsel (Inspector General Division), DHHS, Washington D.C.

- July 1979 - October 1982: Attorney, Office of the General Counsel (Civil Rights Division), DHHS, Washington D.C.

- August 1976 - June 1979: Legislative Counsel for Public Policy, American Association of Homes for the Aging, Washington D.C.

## Education

- The National Law Center, George Washington University, Washington D.C.
  J.D. Degree, 1976

- The State University of New York, Stony Brook, New York
  B.A. with Honors, Political Science, 1973

## Bar Memberships

- District of Columbia (Active)
- Virginia (Inactive)

## Volunteer Activities

- Board Member, Ronald McDonald House Charities of Greater Washington D.C.

**Recent Presentations**

- Annual Compliance Institute, Health Care Compliance Association, Joint presentation with OIG representative, April 2011: *Independent Review Organization: A Contract with the HHS Office of Inspector General*

- Institute on Medicare and Medicaid Payment Issues, American Health Lawyers Association, March 2011: *Medicare Claims Appeals*

- MediRegs Webinar, March 2011: *Compliance Challenge: Understanding Federal and State Exclusions/Debarment Actions, Their Implications, and the Need to Undertake Regular Sanction Screening*

- Annual Compliance Institute, Health Care Compliance Association, Joint presentation with OIG representative, April 2010: *Compliance in an Era of Health Care Reform*

**Recent Publications**

- *The New OIG "Responsible Corporate Officer Doctrine,"* Journal of Health Care Copmpliance, January-February 2011 issue

- *Medicare Raises Standards for Contractor Claim Reviews,* Journal of Health Care Compliance, September-October 2010 issue

- *More Health Care Executive and Board Accountability on the Way,* Journal of Health Care Compliance, July-August 2010 issue (co-authored with Richard Kusserow)

- *Independent Review Organizations Must Meet GAO "Yellow Book" Standards,* Journal of Health Care Compliance, March-April 2010 issue

- *Durable Medical Equipment (DME) Documentation for Medicare Payment,* Journal of Health Care Compliance, January-February 2009 issue

# EXHIBIT H



Christopher C. Puri, Esq.
Bradley Arant Boult Cummings
Roundabout Plaza
1600 Division Street, Suite 700
Nashville, TN 37203

Re: <u>United States of America *ex rel.* Deborah Paradies et al. v. AsceraCare, Inc. and</u>
<u>GGNSC Administrative Services d/b/Golden Living</u>
(E.D.WI) Civil Action, File No. 08-C-0384

Dear Mr. Puri:

This is in response to your request for my review of certain assertions set forth in the *Complaint for Damages and Injunctive Relief Under the False Claims Act* and related documents filed in the above-captioned case, and my professional opinions regarding these representations  You have asked for my review of these issues in light of my professional experience of more than thirty years with the U.S. Department of Health and Human Services (DHHS), and more recently, extensive involvement with activities performed by Independent Review Organizations (IROs) under Corporate Integrity Agreements (CIAs) developed by the DHHS Office of Inspector General (OIG).

In preparing this report, I reviewed the following documents that are related to this case:

- Complaint for Damages and Injunctive Relief Under False Claims Act, filed May 1, 2008.
- Relators' Supplemented Initial Disclosures Pursuant to Fed.R.Civ.P. 26(a)(1), filed December 12, 2011.
- Corporate Integrity Agreement Between the Office of Inspector General of the Department of Health and Human Services and Beverly Enterprises, Inc., effective February 3, 2000.
- Amendment to Corporate Integrity Agreement Between the Office of Inspector General of the Department of Health and Human Services and Beverly Enterprises, Inc., effective April 19, 2004.
- Expert Report of Dr. Kim Kuebler, dated November 15, 2011.

1

- CIA Annual Report and CIA Amendment Implementation Report, submitted to the OIG by Golden Living, dated March 21, 2008, and exhibits.
- Hospice Review Reports done by The Corridor Group for AseraCare in 2007-2008.

I. **PROFESSIONAL BACKGROUND**

Attached to this letter is a curriculum vitae setting forth my qualifications and experience. However, in order to give a specific context to my review and opinions in this particular case, I would like to briefly summarize my professional background.

Upon graduation from law school, I joined the American Association of Homes for the Aging as Legislative Counsel for Public Policy and worked on a variety of issues related to the provision and funding of long term care services. In 1979, I joined the DHHS Office of the General Counsel (OGC) as a trial attorney in the Civil Rights Division. In 1982, shortly after the enactment of the Civil Money Penalties Law (CMPL), (codified at 42 USC § 1320a-7a), I transferred to the Inspector Division of OGC to work on the development of implementing regulations. The CMPL was enacted by Congress as an administrative alternative to actions under the False Claims Act (FCA). Similar to the FCA, it provides for the imposition of penalties, assessments, and program exclusion on any person that "presents or causes to be presented" to DHHS or a State agency a claim for "a medical or other item or service that the person knows or should know was not provided as claimed," or "for a medical or other item or service and the person knows or should know the claim is false or fraudulent."" 42 USC §1320a-7(a)(1). The CMPL further specifies that the term 'should know' means that a person, with respect to information-(A) acts in deliberate ignorance of the truth or false of the information; or (B) acts in reckless disregard of the truth or falsity of the information...." 42 USC 1320a-7(i)(7).

Upon promulgation of implementing regulations, I represented the DHHS Office of Inspector General (OIG) in a number of cases seeking to impose administrative sanctions, *i.e.*, program exclusion and civil money penalties, on individuals and entities determined to have submitted false or fraudulent claims to the Medicare and Medicaid programs, or engaged in other types of improper activities. I was also responsible for conducting an assessment of the legal and evidentiary sufficiency for proposed OIG administrative sanctions. I subsequently was appointed Chief of the Administrative Litigation Branch in the Office of Counsel to the Inspector General (OCIG) and supervised the litigation of administrative sanctions cases on behalf of the OIG for ten years.

https://link.bccb.com/AseraCare/ExpertReports%20Disclsoures/Forms/AllItems.aspx

Congress first authorized the exclusion of physicians and other practitioners convicted of program-related crimes from participation in Medicare and Medicaid in the Medicare

and Medicaid Anti-Fraud and Abuse Amendments of 1977 (Pub. L. 95-142). While I was a member of the OIG's staff, the number and scope of the program exclusion authorities, as well as sanctions imposed by the OIG, grew dramatically. To enhance the DHHS ability to protect the Medicare and Medicaid programs and beneficiaries from

fraud, waste, and abuse, Congress amended on several occasions the program exclusion authority delegated to the OIG (codified at 42 USC 1320a-7). Congressional enactments broadening the OIG's program exclusion authority included:

- The Medicare and Medicaid and Patient and Program Protection Act of 1987 (Pub. L. 100-93)
- The Health Insurance Portability and Accountability Act of 1996 (Pub. L. 104-191)
- The Balanced Budget Act of 1997 (Pub. L. 105-33)

A number of the amendments to the OIG's program exclusion authority were based on OIG reviews, recommendations, reports, and testimony to Congress. In my professional capacity in OIG, I was involved in providing "technical assistance" to Congress regarding legislative changes to the OIG's administrative sanction authorities that were being considered. I was extensively involved in the drafting of the OIG's Special Advisory Bulletin on *The Effect of Exclusion From Participation in Federal Health Care Programs*, which is attached and may also be found on the OIG's web site: http://oig.hhs.gov/fraud/docs/alertsandbulletins/effected.htm. I also served as the OIG's representative on the Inter-Agency Task Force on Debarments and Exclusions, which was charged with establishing uniform Federal policies and procedures with respect to Federal agency administrative sanctions.

In 2002, I was appointed to be an Administrative Appeals Judge (AAJ) on the DHHS Medicare Appeals Council (MAC). The MAC has been delegated the Secretary's authority to adjudicate appeals involving Medicare coverage and payment, pursuant to 42 USC § 1395ff, and is the final administrative tribunal in DHHS before cases are appealed to Federal District Court. As an AAJ on the DHHS MAC, I adjudicated a number of cases and issued many decisions during my tenure (2002-2008).

In December 2008, I retired from Federal service and joined former DHHS Inspector General Richard Kusserow at the health care consulting firm that he founded twenty years ago. I am currently engaged in advising health care providers and practitioners on various issues related to compliance with Federal laws and requirements. Our firm also serves as an OIG-approved Independent Review Organization (IRO) for health care organizations that have entered into a Corporate Integrity Agreement (CIA) with the DHHS OIG. As an IRO, our firm is obligated to undertake specified reviews in accordance with the terms of a CIA, including systems, arrangements, claims, and marketing reviews, and provide reports to the OIG on the findings and recommendations derived from our reviews. Accordingly, I work extensively and am familiar with the terms of CIAs developed and entered into by the OIG.

3

## II.  ISSUE REVIEWED

You have asked for my views with respect to an issue that has been raised in this case related to the interpretation and application of terms and conditions set forth in a CIA between the OIG and Beverly Enterprises, Inc. (Beverly).  Specifically, you have asked me to review and furnish my professional opinion on a representation made in the *Relators' Supplemented Initial Disclosures*, filed on December 12, 2011 at 7.   In that document, the following assertion is made:

> Based on the documents produced by Defendants, Relators contend that Defendants have been in violation of their Corporate Integrity Agreement (CIA) with the United States since at least 2007, but have deliberately concealed their violations from the United States and that, had the United States been aware of those violations, Defendants would have been excluded from the Medicare program as provided by the CIA and federal law. . . . Based on information provided by Defendants, Relators identify $550,533,521.08 in damages to the United States due to Defendants' conduct, through August 2011.

In conducting my review, I considered this representation in conjunction with the referenced CIA and Amendment, and the Annual Report submitted by Beverly to the OIG for calendar year 2007.  With respect to evaluating the Relators' statements, I also considered applicable Federal laws and regulations, as well as the specific terms of the referenced CIA and Amendment, and conducted my review based on my past professional experience in evaluating and imposing program exclusions, drafting and interpreting the terms of CIAs entered into by the OIG, and implementing the specifications set forth in CIAs.  My review was guided by the general principles that I employed in reviewing and litigating program exclusion cases on behalf of the OIG, and following the terms of CIAs executed by the OIG with health care providers.


## III.  DISCUSSION

The Relators state that the defendants were in violation of the terms of CIA with the OIG "since at least 2007."   Further, had the Federal Government been aware of their violations, they "would have been excluded from the Medicare program as provided by the CIA and federal law."   It is implied that if the defendants were excluded from participation in Federal health care programs, then all claims submitted to Medicare for payment subsequent to the effective date of the exclusion would have been false and actionable under the False Claims Act (FCA).

4

## A. Purpose and Enforcement of Corporate Integrity Agreements

Over the past twenty years, there has been a significant evolution in the structure and terms in the Federal Government's settlements relating to health care fraud and abuse. In 1994, the OIG drafted and entered into the first separate CIA with a health care company setting forth specific obligations that the company was required to meet in order to continue participating in Federal health care program, *e.g.,* Medicare and Medicaid. The OIG has described a CIA "as a document that outlines the obligations an entity agrees to as part of a civil settlement." The OIG further explains:

> An entity agrees to the CIA obligations in exchange for the OIG's agreement that it won't seek to exclude [the] entity from participation in Medicare, Medicaid, or other Federal health care programs. The CIAs have common elements, but each one is tailored to address the specific facts of the case and CIAs are often drafted to recognize the elements of a pre-existing compliance program.

OIG internet web site: http://oig.hhs.gov/faqs/corporate-integrity-agreements-faq.asp.

In the OIG's Semiannual Report to Congress in October 2011, the current Inspector General highlighted that:

> OIG enters into Corporate Integrity Agreements with providers as a part of the settlement of False Claims Act cases to help ensure future compliance. However, if providers violate the terms of those agreements, OIG holds them accountable, such as by imposing penalties or, for serious breaches, by moving to exclude them from participating in Federal health care programs.

http://oig.hhs.gov/reports-and-publications/semiannual/index.asp

The OIG Report goes on to note:

> Many health care providers that enter into agreements with the Federal Government to settle potential liabilities under the FCA also agree to adhere to a separate CIA with OIG. In a CIA, a provider typically commits to establishing a program or taking other specified steps to ensure future compliance with Medicare and Medicaid rules. The compliance programs are designed, in part, to prevent a recurrence of the underlying fraudulent conduct. OIG monitors providers' compliance with these agreements.

5

*Id.* at vii.    The OIG reported that, during the six month period ending September 30, 2011, it imposed stipulated penalties totaling $272,500 on two companies . . . because they did not comply with requirements of their CIAs with OIG." *Id.* at vii.

### B.  Terms of Corporate Integrity Agreement Between Beverly and OIG

Beverly entered into a CIA with the DHHS OIG effective February 3, 2000.  Following is a summary of key provisions in the CIA that are relevant to reviewing the representations in the complaint:

- Beverly entered into the CIA "to ensure compliance by Beverly, "and the subsidiaries and affiliates through which it operates . . . , and Beverly's officers, directors and employees with the requirements of Medicare, Medicaid and all other Federal health care programs."  (page 1)

- Beverly assumed compliance obligations under the CIA for a period of nine years from the effective date (February 3, 2000), "or for the period of time Beverly remains obligated by the payment terms of the Settlement Agreement, whichever is shorter, but in any event for not less than five years."   Thus, at a minimum, Beverly was obligated to comply with the CIA through February 2, 2005. (page 1)

- Beverly was required to retain an IRO "to perform review procedures to assist Beverly and the OIG in assessing the adequacy of Beverly's submissions to Federal health care programs and its compliance with the CIA." (page 11)

- The IRO was to be "independent from Beverly and . . . have expertise in the billing, reporting and other requirements of the Federal health care programs from which Beverly seeks reimbursement." (page 11)

- The IRO was obligated to perform two types of reviews: a "Submissions Engagement" that was an "analysis of Beverly's claims submissions to the Federal health care programs to assist Beverly and OIG in determining compliance with all applicable statutes, regulations, and directives/guidance," and a "Compliance Engagement," to "determine whether Beverly [was] in compliance with this CIA."  The IRO was obligated to "produce a separate report for each engagement." (pages 11-12)

- Beverly's Internal Audit Department was obligated to separately "implement and oversee" a Minimum Data Set ("MDS") Audit, to review claims submitted by its "facilities." (page 12).

6

- Findings derived from the reviews performed by Beverly's Internal Audit Department and "the reviews performed by the IRO [were to] be communicated to the OIG in [an] Annual Report." (page 15)

- The IRO's annual "Submissions Engagement" analysis was to include findings regarding Beverly's documentation, billing, and reporting, submission of accurate claims and resident assessments, and "adequacy of controls to correct inaccurate claims and resident assessments." (page 16)

- The IRO's "compliance engagement" was to determine whether Beverly's "program, policies, procedures, and operations comply with the terms of [the] CIA [and] include section by section findings regarding the requirements of [the] CIA." The CIA specified that Beverly was to "report the findings of the IRO's compliance engagement in its Annual Report to the OIG." (page 17).

- If Beverly determined there was a "material deficiency," it was required to notify the OIG within 30 days of discovery. (page 22)

- A "material deficiency" was defined as 1) "a substantial overpayment from any Federal health care program;" 2) "a matter that a reasonable person would consider a potential violation" of a criminal or civil law provision, or the OIG's exclusion or civil money penalty authority, "applicable to any Federal health care program;" 3) "a violation of the obligation to provide items or services of a quality that meets professionally recognized standards of health care" and there was "imminent danger to the health, safety or well-being" of a program beneficiary, or a beneficiary is placed "unnecessarily in [a] high risk situation." (page 22)

- "As a contractual remedy, Beverly and OIG . . . agree[d] that failure to comply with certain obligations set forth in [the] CIA may lead to the imposition of . . . monetary penalties," which were referred to as "Stipulated Penalties." (page 29)

- "Provisions for the payment of Stipulated Penalties [would] not affect or otherwise set a standard for the OIG's decision that Beverly has materially breached th[e] CIA, which decision [was to] be made at the OIG's discretion." (pages 31-32)

- The OIG was to notify Beverly if it determined that a material breach of the CIA occurred and that the OIG was intending to "exercise its contractual right to impose exclusion." Beverly was to have 30 days from the date of receipt of the OIG's Notice of Material Breach and Intent to Exclude" to demonstrate that

7

1) Beverly was in compliance with the CIA; 2) "the alleged material breach ha[d] been cured; or 3) that Beverly was taking steps with "due diligence" to cure the material breach. (page 32)

- At the conclusion of the 30 day period, the OIG could "notify Beverly in writing of its determination to exclude Beverly." (page 32)

- A "material breach" of the CIA was defined as: 1) "a failure of Beverly to report a material deficiency, take correction action, and pay the appropriate funds;" 2) repeated and flagrant violations of the obligations under [the] CIA that have not been cured in a timely fashion; 3) "a failure to respond to a Demand Letter concerning payment of Stipulated Penalties;" or 4) "failure to retain and use an" IRO. (page 33)

- "As an agreed-upon contractual remedy for the resolution of disputes arising under the obligation of this CIA, Beverly was afforded certain review rights comparable to the ones that [were] provided in 42 USC 1320a-7(f) and 42 CFR Part 1005." Specifically, an OIG determination to impose a program exclusion was "subject to review by an ALJ and, in the event of an appeal, the Departmental Appeals Board (DAB) in a manner consistent with the provisions of 42 CFR 1005.2 – 1005.21." A program exclusion imposed by the OIG was to "take effect only after an ALJ decision that [was] favorable to the OIG." (pages 33-34)

- The CIA was "binding on the successors, assigns, and transferees of Beverly (except that the obligations of th[e] CIA shall not apply to facilities that Beverly or a Beverly successor does not own or operate)." (page 35)

Effective April 19, 2004, Beverly and the OIG executed an Amendment to the above-referenced CIA. Following is a summary of key provisions in the Amendment that are relevant to reviewing the representations in the complaint:

- "The period of the compliance obligations assumed by Beverly under [the] Amendment [were] coterminous with the CIA (unless otherwise specified)." (page 1)

- The Amendment was applicable to a "Covered Facility," which was defined as "all the nursing home facilities that are licensed, operated, directed, or administered by Beverly or in which Beverly has an ownership or control interest." (page 1)

- The Amendment was applicable to "Covered Persons," which included "employees, contractors and agents who work at a Covered Facility." (page 1).

8

- Beverly retained the "Long Term Care Institute (LTCI) as the appropriately qualified monitoring team (the "Monitor"), approved by the OIG." "The Monitor [had] access to . . . Covered Facilities, at any time and without prior notice." (pages 10-11).

- If the OIG determined that Beverly had failed to comply with the terms of the Amendment, the OIG would provide Beverly with prompt written notification and the opportunity to cure the alleged "noncompliance." (page 19)

- "Upon the OIG's delivery to Beverly of its Noncompliance Notice, and as an agreed-upon contractual remedy for the resolution of disputes arising under the obligations of this Amendment, Beverly [was to] be afforded certain review rights comparable to those set forth in 42 USC 1320a-7(f) and 42 CFR Part 1005 as if they applied to the specific performance, Stipulated Penalties, or exclusion sought pursuant to this Amendment." (page 21)

- "The review by an ALJ or DAB provided for [in the Amendment was] not be considered to be an appeal right arising under any statutes or regulations." (page 21).

- "The original CIA and . . . Amendment [were] by and between the parties . . . and for their sole benefit and not for the benefit of any third parties." Further, "neither the original CIA nor th[e] Amendment . . . create[d] or [was to] be construed or interpreted to create any benefit for any person not a party to the original CIA or this Amendment or create any right or cause of action in or on behalf of any person . . . other than the parties." (page 22)

C. **OIG Authority to Exclude Beverly from Participation in Federal Health Care Programs**

The OIG has been delegated the DHHS statutory authority to exclude individuals and entities from participation in Federal health care programs. The OIG has the authority to impose both "mandatory" and "discretionary" exclusions.

The current law requires that the OIG exclude an individual or entity from participation in Federal health care programs based on four specified occurrences:

- Conviction of a program-related crime;
- Conviction of patient abuse or neglect;
- Felony conviction related to other health care-related fraud, theft, or other financial misconduct; and

9

- Felony conviction related to the unlawful manufacture, distribution, prescription or dispensing of controlled substances.

*See* 42 USC 1320a-7(a). The OIG has also been delegated the discretionary authority to exclude an individual or entity from participation in Federal health care programs for various other types of misconduct, including:

- Revocation or suspension of a license to provide health care for reasons bearing on professional competence, professional performance, or financial integrity;
- Provision of unnecessary or substandard services;
- Submission of false or fraudulent claims to a Federal health care program;
- Engaging in an unlawful kickback arrangement;
- Default on a health education loan or scholarship obligation.

*See* 42 USC 1320a-7(b) and 42 USC 1320c-5. The statute does not authorize the exclusion of an individual or entity that has breached the terms of a CIA with the OIG.

Regardless of the statutory basis of an OIG exclusion, all exclusions may be appealed to an DHHS Administrative Law Judge (ALJ), and any subsequent adverse decision appealed to the DHHS Departmental Appeals Board (DAB), with judicial review after a final DAB decision. *See* 42 USC 1320a-7(f); 42 CFR Part 1005.

The effect of an OIG exclusion from Federal health care programs is that no Federal payments may be made for items or services either furnished by an excluded individual or entity, or directed or prescribed by an excluded physician or other authorized individual. *See* 42 CFR 1001.1901. In September 1999, the OIG issued a Special Advisory Bulletin elaborating on the Effect of Exclusion from Participation in Federal Health Care Programs. *See* Attachment.

Under the CIA and Amendment discussed above, the OIG had the discretionary authority to exclude Beverly if it determined that Beverly was in "material breach" of the terms of the CIA. If the OIG determined that material breach had occurred, Beverly was to be given notice and the opportunity to cure the alleged breach. If the OIG determined that the identified breach had not been cured, the CIA specified that OIG had the "contractual right to impose exclusion." CIA at 32. The CIA noted further that "[a]s an agreed-upon contractual remedy for the resolution of disputes arising under the [CIA], Beverly shall be afforded certain review rights," consistent with the appeal rights afforded to an individual or entity excluded by the OIG under its statutory authority. *Id.* at 33.

**D.  OIG Imposition of Program Exclusions**

10

The OIG reported that during Fiscal Year (FY) 2011, it had excluded 2,662 individuals and entities from participation in Federal health care programs under its statutory authorities. No exclusions based on breach of a CIA were reported. *See* DHHS OIG Semi-Annual Report to Congress, Fall 2011, at i.

Over the course of the many years that the OIG has been developing and entering into CIAs with health care providers and practitioners, there has been only one instance where the OIG excluded a health care provider based on a breach of its CIA obligations. *See* Attachment. As noted in the OIG's press release, in 2006 a hospital was excluded due to "repeated and flagrant violations of its obligations under the CIA." While the provider was given the opportunity to "cure" the material breach alleged by the OIG, the OIG determined after subsequent review "that the hospital had failed to take timely corrective actions necessary to cure the breach." Thus, based on the provider's "failure to cure the breach, the OIG [exercised] its contractual right to excluded South Beach from participation in all Federal health care programs for a period of five years." *Id.*

E. Evaluation and Opinion

I have been asked to address the following issue as articulated by the Relators:

Defendants have been in violation of their Corporate Integrity Agreement (CIA) with the United States since at least 2007, but have deliberately concealed their violations from the United States and that, had the United States been aware of those violations, Defendants would have been excluded from the Medicare program as provided by the CIA and federal law. . . .

Relators' Supplemented Initial Disclosures at 7.

At the outset, let me state that my evaluation and opinions are based solely on the documents referenced on the first page of this report, and reflect my past and current professional experience and familiarity with the OIG, the exclusion authority delegated to and administered by the OIG, and the effectuation of terms of CIAs, including required IRO reviews and reports.

Several salient facts need to be taken into consideration in evaluating the Relators' assertions.

- The Relators assert that the defendants have been in violation of their CIA "since at least 2007," and had the United States been aware of Beverly's failure to comply with the terms of its CIA, the company would have been excluded by the OIG from program participation.

  The CIA became effective February 3, 2000, and was to remain in effect for nine years, or for the "period of time Beverly remains obligated by the payment terms

11

of the Settlement Agreement, whichever is shorter, but in any event for not less than five years." CIA at 1. Beverly's obligations under the CIA and the OIG's authority to exclude Beverly for a "material breach" were (at a minimum) operative from February 3, 2000 to at February 2, 2005. It appears from the documents I reviewed that the CIA remained in effect through December 31, 2007. According to the Relators, the operative year with respect to the defendants' alleged violations of the CIA was 2007. Thus, the Beverly Annual Report, and related IRO, Monitor, and Internal Audit reports covering that year are relevant in assessing the Relators' allegations.

- The Relators' statement that the defendants "would have been excluded from the Medicare program" is not supportable under either the CIA or the OIG's statutory exclusion authority. As noted in various sections of the CIA and Amendment, the OIG's exclusion remedy for an identified "material breach" was discretionary and based solely on the contractual nature of the CIA; not the OIG exclusion authority codified at 42 USC 1320a-7 and 42 USC 1395c-5. Under the CIA, if there was an OIG determination of material breach, then Beverly was to be given the opportunity to cure the breach. Further, if the OIG determined that a material breach had not been cured, it retained the discretion on whether or not to exclude Beverly from participation in Federal health care programs. If such an exclusion had been imposed, Beverly would have retained appeal rights as specified in 42 CFR Part 1005. Thus, there would have been three levels of administrative appeals available to Beverly to challenge a proposed exclusion from program participation: OIG, ALJ, and DAB review. The Relators do not acknowledge these appeal rights. Nor do the documents I reviewed indicate that there was any OIG notification to Beverly during the effective period of the CIA of a potential "material breach" and/or proposal to exclude the company from participation from Federal health care programs.

- With respect to an exclusion under "federal law," the Relators presumably are referencing the OIG's authority to exclude an individual or entity for "fraud, kickbacks, and other prohibited activities," as specified in 42 USC 1320a-7a, 1320a-7b, or 1320a-8. Yet, a proposed OIG exclusion under any of these authorities would afford Beverly appeal rights under the procedures set forth in 42 CFR Part 1005. These appeal rights are not addressed by the Relators.

- The Relators' assertion that the defendants' alleged violation of the terms of the CIA would have resulted in exclusion from program participation does not comport with OIG's past history of exercising this "contractual right" to bar an entity from future participation in Federal health care programs. The goal of a CIA is to ensure that a health care provider meets certain specified obligations as a condition for continued program participation. If there is a breach by the provider, the OIG seeks to remedy the problem. Thus, as announced by the OIG in 2006, there has only been one instance where the OIG has had to exclude a

12

health care provider based on "repeated and flagrant violations of its obligations under the CIA." This exclusion was imposed after the provider was given the opportunity to cure the breach.

- The Relators do not acknowledge that the CIA required Beverly to retain one or more independent IROs with "expertise in billing, reporting, and other requirements of Federal health care programs" to: (1) conduct an annual analysis of Beverly's claims submissions to Federal health care programs to assist Beverly and OIG in determining compliance (Submissions Engagement), and (2) a separate review to "determine whether Beverly is in compliance with [the] CIA (Compliance Engagement). The results of these IRO reviews were to "be communicated to the OIG in the [Beverly] Annual Report." CIA at 15.

  As noted by the OIG on its web site, an IRO in conducting the reviews specified in a CIA, must meet the "independence" and "objectivity" standards specified by the General Accountability Office as Generally Accepted Government Accounting Standards ("GAGAS"). Thus, to the extent that deficiencies existed during the years that Beverly was subject to the CIA, they would have been identified and reported by the IRO. There is no indication in the IRO Report appended to the Beverly Annual Report to the OIG for 2007 (the year referenced by the Relators) that there were any deficiencies in Beverly's claims submissions.

  With respect to the IRO's "Claims Testing" for 2007, it found as follows:

  > Of the 156 claims we tested, we agreed with the Company's Auditor's RUG scores in 155 claims. We disagreed with the Company's Auditor's RUG score in one claim. This variance resulted in an underpayment to the facility. *See* Attachment I to the Beverly Annual Report for 2007.

  Beverly Annual Report, Exhibit I at 7. Accordingly, with respect to Beverly's submission of claims for payment, the IRO "noted no recommendations for improvement." *Id.* Similarly, with respect to its evaluation of Beverly's compliance with Settlement Agreement Obligations, the IRO "noted no recommendations for improvement." *Id.* at 9.

  There is no indication that the IRO report for 2007 raised any concerns sufficient to cause the OIG to determine "material breach" and propose Beverly's program exclusion. Nor is there any evidence in the report that the professionally qualified, independent, and objective IRO identified any violations of Beverly's CIA, as alleged by the Relators.

- Under the Amendment to the CIA, Beverly was obligated to retain an independent Monitor to assess the quality of care at its facilities. During the time period July 1, 2006 through August 31, 2007, the Monitor assessed the

13

quality of care furnished at facilities operated by Beverly Living Centers and Golden Living Centers. The Monitor concluded that "[w]ith respect to performance outcomes," both companies "maintained their strong performance trends of the past. . . . Taken together, the two corporations are among the leaders in deficiency performance among the comparison corporations." The Monitor further concluded that "the corporations also did well in terms of their degree of commitment to the quality improvement and compliance process, as well as their cooperation with the independent monitor." *Id.* at 27. There is no indication that the independent Monitor's report dated October 15, 2007, raised any concerns sufficient to cause the OIG to determine "material breach" and propose Beverly's program exclusion. Nor is there any evidence in the report that the independent Monitor identified any violations of Beverly's CIA, as alleged by the Relators. *See* Attachment L to the Beverly Annual Report for 2007.

- Under the CIA and its Amendment, a "covered facility" included all the nursing home facilities that were licensed, operated, directed, or administered by Beverly, or in which Beverly has an ownership or control interest." Amendment at 1. Therefore, it appears that the obligations of the CIA were directed at Beverly's skilled nursing facilities. This interpretation appears to be supported by the reports issued by both the IRO and independent monitor, as well as the Beverly's Annual Report for 2007, all referencing skilled nursing facilities that were owned or operated by Beverly. Further, a review of correspondence between the OIG and Beverly related to the terms of the CIA appears to support this interpretation of the scope of the CIA. *See* Attachment A to the Beverly Annual Report for 2007. Thus, the Relators' complaint, which focuses on Medicare claims for hospice services, does not appear to support their assertion that Beverly was in violation of the terms of its CIA (which was focused on skilled nursing facilities) and would have been excluded from program participation.

- Despite the focus of the CIA on skilled nursing facilities owned and/or operated by Beverly, its Annual Report for 2007 discusses "Aggregate Overpayments That Have Been Returned to Federal Health Care Programs That Were Discovered as a Direct or Indirect Result of Implementing [the] CIA," and includes identified overpayments for hospice services. It notes that "in 2007, we had a repayment for Hospice [services] secondary to the annual cap placed on CMS on the amount of Medicare payments a provider can receive based on the number of unduplicated Medicare admissions in a cap year." It reports on the amount of overpayments received for hospice services furnished between 2003 and 2007 and refunded to the Medicare program. *See* Attachment M to the Beverly Annual Report for 2007. These disclosures and reported repayments of overpayments related to hospice services are inconsistent with the Relators' allegations.

14

- The Relators' expert, Dr. Kim Kuebler, states in her report: "[I]t is my opinion that there has been a long-standing history of a flawed compliance program." Expert Report at 7. Yet, none of the IRO or independent Monitor reports reviewed support this hypothesis. In my experience, a professionally qualified, independent and objective IRO would have identified and reported to the OIG on such a "flawed compliance program." Similarly, the independent Monitor would not have reported that "the corporations . . . did well in terms of their degree of commitment to quality improvement and compliance process." Attachment L to the Beverly Annual Report for 2007 at 27.

- Relator's expert appears to be relying on reports prepared by The Corridor Group concerning the compliance of various facilities with the conditions of participation for hospice established by CMS. Conditions of participation relate to eligibility of a health care provider to participate in the Medicare program, and are generally not dispositive with respect to the validity of claims for Medicare payment. The Corridor Group reports appear to be consistent with a health care provider's obligation to undertake auditing and monitoring as part of an effective compliance program.

## IV. CONCLUSION

Based on my experience in working both for and with the DHHS OIG, being engaged to work as an IRO, and review of identified documents, it is my opinion that the OIG would not have excluded Beverly from participation in Federal health care programs for conduct in or prior to 2007 that were deemed to be violations of the CIA, as asserted by the Relators.

## V. EXHIBITS

The following documents are appended as attachments:

- OIG News Release: *OIG Excludes Miami Hospital From Participation in Federal Health Care Programs*, dated March 10, 2006;
- Excerpt from OIG List of Excluded Individuals and Entities (LEIE) reporting on the exclusion of South Beach Community Hospital for "Breach of CIA;"
- OIG Special Advisory Bulletin: *The Effect of Exclusion from Participation in Federal Health Care Programs* (September 1999).

## VI. QUALIFICATIONS

In addition to my professional experience as described above, my curriculum vitae is attached.

15

## VII. OTHER TESTIMONY

I was retained as an expert and provided a report and deposition in the following case: United States *ex rel.* Samuel L. Armfield, and Patricia Armfield v. James P. Gills, et al., (MD FL), Case No. 8:07-CV-2374-T-27TBM

## VIII. PUBLICATIONS

*The New OIG "Responsible Corporate Officer Doctrine,"* Journal of Health Care Compliance, January-February 2011 issue

*Medicare Raises Standards for Contractor Claim Reviews,* Journal of Health Care Compliance, September-October 2010 issue

*More Health Care Executive and Board Accountability on the Way,* Journal of Health Care Compliance, July-August 2010 issue (co-authored with Richard Kusserow)

*Independent Review Organizations Must Meet GAO "Yellow Book" Standards,* Journal of Health Care Compliance, March-April 2010 issue

*Durable Medical Equipment (DME) Documentation for Medicare Payment,* Journal of Health Care Compliance, January-February 2009 issue

## IX. COMPENSATION

I have been retained as an expert in this case. My employer, Strategic Management Services, LLC will be paid for my services at an hourly rate of $575, in addition to any case-related travel and related expenses.


Sincerely yours,


Thomas E. Herrmann, J.D.

Senior Vice President

16



# OIG NEWS

For Immediate Release
(202) 619-1343
March 10, 2006

Office of Inspector General
330 Independence Ave., SW
Washington, D.C. 20201

### OIG Excludes Miami Hospital from Participation in Federal Health Care Programs

Inspector General Daniel R. Levinson announced today that the Office of Inspector General (OIG) of the Department of Health and Human Services (HHS) is excluding Miami's South Beach Community Hospital (South Beach), formerly known as South Shore Hospital and Medical Center, from participation in Medicare, Medicaid, and all other Federal health care programs. Today's action resulted from South Beach's material breach of the terms of a corporate integrity agreement (CIA) it negotiated with OIG in 2002, as part of the resolution of a False Claims Act case against the hospital.

"South Beach has committed repeated and flagrant violations of its obligations under the CIA," said Inspector General Levinson. "This exclusion sends a clear message to the provider community that the OIG will not hesitate to pursue an action against those providers that fail to abide by their integrity agreement obligations."

On December 2, 2005, the OIG notified the hospital that the OIG intended to exclude South Beach based on the hospital's material breach of its obligations under the CIA. For example, South Beach failed to meet multiple reporting requirements, failed to retain an Independent Review Organization to perform required audits, and failed to provide notification of the sale of the hospital. South Beach had 30 days to demonstrate that it was in compliance with the obligations of the agreement, that it had cured the breach, or that it was timely pursuing cure of the breach with due diligence.

In December 2005, South Beach represented to the OIG that it would cure the material breach of the CIA by February 28, 2006. The OIG reviewed written submissions and performed a site visit at the facility to evaluate the extent to which South Beach may have cured the material breach. Based on this review, the OIG determined that the hospital had failed to take timely corrective actions necessary to cure the breach, and, in fact had failed to meet its own timetable to take such actions.

Based on South Beach's failure to cure the breach, the OIG is exercising its contractual right to exclude South Beach from participation in all Federal health care programs for a period of five years. The hospital has the right to request a hearing before an HHS Administrative Law Judge, with a right to further appeal to the HHS Departmental Appeals Board.

####



**Office of Inspector General**
U.S. Department of Health & Human Services

**Detail Results**

Verification for SOUTH BEACH COMMUNITY HOSPITAL

| | |
|---|---|
| Name: | N/A |
| Business: | SOUTH BEACH COMMUNITY HOSPITAL |
| UPIN: | No data |
| DOB: | No data |
| General: | HOSPITAL |
| Excl Type: | BREACH OF CIA |
| Specialty: | No data |
| Address: | 630 ALTON RD |
| | MIAMI BEACH,  FL  331390000 |
| Date: | 04/10/2006 |
| Reinstmt: | No data |

Enter only numbers. Format like: 111553333

SSN/EIN:

Verify

Search conducted 1/16/2012 4:45:35 PM EST on OIG
LEIE Exclusions database.
Source data updated on 1/6/2012 11:14:05 AM EST

https://exclusions.oig.hhs.gov/Verification.aspx                                                            1/16/2012



# Special Advisory Bulletin

## The Effect of Exclusion From Participation in Federal Health Care Programs

___

September 1999

### A. Introduction

The Office of Inspector General (OIG) was established in the U.S. Department of Health and Human Services to identify and eliminate fraud, waste, and abuse in the Department's programs and to promote efficiency and economy in Departmental operations. The OIG carries out this mission through a nationwide program of audits, inspections, and investigations. In addition, the OIG has been given the authority to exclude from participation in Medicare, Medicaid and other Federal health care programs[1] individuals and entities who have engaged in fraud or abuse, and to impose civil money penalties (CMPs) for certain misconduct related to Federal health care programs (sections 1128 and 1128A of the Social Security Act (the Act)).

Recent statutory enactments have strengthened and expanded the OIG's authority to exclude individuals and entities from the Federal health care programs. These laws also expanded the OIG's authority to assess CMPs against individuals and entities that violate the law. With this expanded authority, the OIG believes that it is important to explain the effect of program exclusions under the current statutory and regulatory provisions.

The Health Insurance Portability and Accountability Act (HIPAA) of 1996, Public Law 104-191, authorized the OIG to provide guidance to the health care industry to prevent fraud and abuse, and to promote high levels of ethical and lawful conduct. To further these goals, the OIG issues Special Advisory Bulletins about industry practices or arrangements that potentially implicate the fraud and abuse authorities subject to enforcement by the OIG.

In order to assist all affected parties in understanding the breadth of the payment prohibitions that apply to items and services provided to Federal program beneficiaries,[2] this Special Advisory Bulletin provides guidance to individuals and entities that have been excluded from Federal health care programs, as well as to those who might employ or contract with an excluded individual or entity to provide items or services reimbursed by a Federal health care program.

### B. Statutory Background

In 1977, in the Medicare-Medicaid Anti-Fraud and Abuse Amendments, Public Law 95-142, Congress first mandated the exclusion of physicians and other practitioners convicted of program-related crimes from participation in Medicare and Medicaid (now codified at section 1128 of the Act). This was followed in 1981 with Congressional enactment of the Civil Monetary Penalties Law (CMPL), Public Law 97-35, to further address health care fraud and abuse (section 1128A of the Act). The CMPL authorizes the Department and the OIG to impose CMPs, assessments and program exclusions against

Case 2:08-cv-00384-JPS    Filed 01/19/12    Page 24 of 32    Document 95-5

individuals and entities who submit false or fraudulent, or otherwise improper claims for Medicare or Medicaid payment. "Improper claims" include claims submitted by an excluded individual or entity for items or services furnished during a period of program exclusion.

To enhance the OIG's ability to protect the Medicare and Medicaid programs and beneficiaries, the Medicare and Medicaid Patient and Program Protection Act of 1987, Public Law 100-93, expanded and revised the OIG's administrative sanction authorities by, among other things, establishing certain mandatory and discretionary exclusions for various types of misconduct.

The enactment of HIPAA in 1996 and the Balanced Budget Act (BBA) of 1997, Public Law 105-33, further expanded the OIG's sanction authorities. These statutes extended the application and scope of the current CMP and exclusion authorities beyond programs funded by the Department to all "Federal health care programs." BBA also authorized a new CMP authority to be imposed against health care providers or entities that employ or enter into contracts with excluded individuals for the provision of services or items to Federal program beneficiaries.

In the discussion that follows, it should be understood that the prohibitions being described apply to items and services provided, directly or indirectly, to Federal program beneficiaries. The ability of an excluded individual or entity to render items and services to others is not affected by an OIG exclusion.

## C. Exclusion from Federal Health Care Programs

The effect of an OIG exclusion from Federal health care programs is that no Federal health care program payment may be made for any items or services (1) furnished by an excluded individual or entity, or (2) directed or prescribed by an excluded physician (42 CFR 1001.1901). This payment ban applies to all methods of Federal program reimbursement, whether payment results from itemized claims, cost reports, fee schedules or a prospective payment system (PPS). Any items and services furnished by an excluded individual or entity are not reimbursable under Federal health care programs. In addition, any items and services furnished at the medical direction or prescription of an excluded physician are not reimbursable when the individual or entity furnishing the services either knows or should know of the exclusion. This prohibition applies even when the Federal payment itself is made to another provider, practitioner or supplier that is not excluded.

The prohibition against Federal program payment for items or services furnished by excluded individuals or entities also extends to payment for administrative and management services not directly related to patient care, but that are a necessary component of providing items and services to Federal program beneficiaries. This prohibition continues to apply to an individual even if he or she changes from one health care profession to another while excluded.[3] In addition, no Federal program payment may be made to cover an excluded individual's salary, expenses or fringe benefits, regardless of whether they provide direct patient care.

Set forth below is a listing of some of the types of items or services that are reimbursed by Federal health care programs which, when provided by excluded parties, violate an OIG exclusion. These examples also demonstrate the kinds of items and services that excluded parties may be furnishing which will subject their employer or contractor to possible CMP liability.

- Services performed by excluded nurses, technicians or other excluded individuals who work for a hospital, nursing home, home health agency or physician practice, where such services are related to administrative duties, preparation of surgical trays or review of treatment plans if such services are reimbursed directly or indirectly (such as through a PPS or a bundled payment) by a Federal health care program, even if the individuals do not furnish direct care to Federal program

beneficiaries;

- Services performed by excluded pharmacists or other excluded individuals who input prescription information for pharmacy billing or who are involved in any way in filling prescriptions for drugs reimbursed, directly or indirectly, by any Federal health care program;

- Services performed by excluded ambulance drivers, dispatchers and other employees involved in providing transportation reimbursed by a Federal health care program, to hospital patients or nursing home residents;

- Services performed for program beneficiaries by excluded individuals who sell, deliver or refill orders for medical devices or equipment being reimbursed by a Federal health care program;

- Services performed by excluded social workers who are employed by health care entities to provide services to Federal program beneficiaries, and whose services are reimbursed, directly or indirectly, by a Federal health care program;

- Administrative services, including the processing of claims for payment, performed for a Medicare intermediary or carrier, or a Medicaid fiscal agent, by an excluded individual;

- Services performed by an excluded administrator, billing agent, accountant, claims processor or utilization reviewer that are related to and reimbursed, directly or indirectly, by a Federal health care program;

- Items or services provided to a program beneficiary by an excluded individual who works for an entity that has a contractual agreement with, and is paid by, a Federal health care program; and

- Items or equipment sold by an excluded manufacturer or supplier, used in the care or treatment of beneficiaries and reimbursed, directly or indirectly, by a Federal health care program.

## D. Violation of an OIG Exclusion By an Excluded Individual or Entity

An excluded party is in violation of its exclusion if it furnishes to Federal program beneficiaries items or services for which Federal health care program payment is sought. An excluded individual or entity that submits a claim for reimbursement to a Federal health care program, or causes such a claim to be submitted, may be subject to a CMP of $10,000 for each item or service furnished during the period that the person or entity was excluded (section 1128A(a)(1)(D) of the Act). The individual or entity may also be subject to treble damages for the amount claimed for each item or service. In addition, since reinstatement into the programs is not automatic, the excluded individual may jeopardize future reinstatement into Federal health care programs (42 CFR 1001.3002).

## E. Employing an Excluded Individual or Entity

As indicated above, BBA authorizes the imposition of CMPs against health care providers and entities that employ or enter into contracts with excluded individuals or entities to provide items or services to Federal program beneficiaries (section 1128A(a)(6) of the Act; 42 CFR 1003.102(a)(2)). This authority parallels the CMP for health maintenance organizations that employ or contract with excluded individuals (section 1857(g)(1)(G) of the Act). Under the CMP authority, providers such as hospitals, nursing homes, hospices and group medical practices may face CMP exposure if they submit claims to a Federal health care program for health care items or services provided, directly or indirectly, by

Case 2:08-cv-00384-JPS   Filed 01/19/12   Page 26 of 32   Document 95-5

excluded individuals or entities.

Thus, a provider or entity that receives Federal health care funding may only employ an excluded individual in limited situations. Those situations would include instances where the provider is both able to pay the individual exclusively with private funds or from other non-federal funding sources, and where the services furnished by the excluded individual relate solely to non-federal program patients.

In many instances, the practical effect of an OIG exclusion is to preclude employment of an excluded individual in any capacity by a health care provider that receives reimbursement, indirectly or directly, from any Federal health care program.

### F. CMP Liability for Employing or Contracting with an Excluded Individual or Entity

If a health care provider arranges or contracts (by employment or otherwise) with an individual or entity who is excluded by the OIG from program participation for the provision of items or services reimbursable under such a Federal program, the provider may be subject to CMP liability if they render services reimbursed, directly or indirectly, by such a program. CMPs of up to $10,000 for each item or service furnished by the excluded individual or entity and listed on a claim submitted for Federal program reimbursement, as well as an assessment of up to three times the amount claimed and program exclusion may be imposed. For liability to be imposed, the statute requires that the provider submitting the claims for health care items or services furnished by an excluded individual or entity "knows or should know" that the person was excluded from participation in the Federal health care programs (section 1128A(a)(6) of the Act; 42 CFR 1003.102(a)(2)). Providers and contracting entities have an affirmative duty to check the program exclusion status of individuals and entities prior to entering into employment or contractual relationships, or run the risk of CMP liability if they fail to do so.

### G. How to Determine If an Individual or Entity is Excluded

In order to avoid potential CMP liability, the OIG urges health care providers and entities to check the OIG List of Excluded Individuals/Entities on the OIG web site (www.hhs.gov/oig) prior to hiring or contracting with individuals or entities. In addition, if they have not already done so, health care providers should periodically check the OIG web site for determining the participation/exclusion status of current employees and contractors. The web site contains OIG program exclusion information and is updated in both on-line searchable and downloadable formats. This information is updated on a regular basis. The OIG web site sorts the exclusion of individuals and entities by: (1) the legal basis for the exclusion, (2) the types of individuals and entities that have been excluded, and (3) the State where the excluded individual resided at the time they were excluded or the State where the entity was doing business. In addition, the entire exclusion file may be downloaded for persons who wish to set up their own database. Monthly updates are posted to the downloadable information on the web site.

### H. Conclusion

In accordance with the expanded sanction authority provided in HIPAA and BBA, and with limited exceptions[(4)], an exclusion from Federal health care programs effectively precludes an excluded individual or entity from being employed by, or under contract with, any practitioner, provider or supplier to provide any items and services reimbursed by a Federal health care program. This broad prohibition applies whether the Federal reimbursement is based on itemized claims, cost reports, fee schedules or PPS. Furthermore, it should be recognized that an exclusion remains in effect until the individual or entity has been reinstated to participate in Federal health care programs in accordance with the procedures set forth at 42 CFR 1001.3001 through 1001.3005. Reinstatement does not occur automatically at the end of a term of exclusion, but rather, an excluded party must apply for

reinstatement.

If you are an excluded individual or entity, or are considering hiring or contracting with an excluded individual or entity, and question whether or not the employment arrangement may violate the law, the OIG Advisory Opinion process is available to offer formal binding guidance on whether an employment or contractual arrangement may be in violation of the OIG's exclusion and CMP authorities. The process and procedure for submitting an advisory opinion request can be found at 42 CFR 1008, or on the OIG web site at www.hhs.gov/oig.

1. A Federal health care program is defined as any plan or program that provides health benefits, whether directly, through insurance, or otherwise, which is funded directly, in whole or in part, by the United States Government or a State health care program (with the exception of the Federal Employees Health Benefits Program) (section 1128B(f) of the Act). The most significant Federal health care programs are Medicare, Medicaid, Tricare and the Veterans programs.

2. A Federal program beneficiary is an individual that receives health care benefits that are funded, in whole or in part, by a Federal health care program.

3. For example, the prohibition against Federal program payment for items and services would continue to apply in the situation where an excluded pharmacist completes his or her medical degree and becomes a licensed physician.

4. In certain instances, a State health care program may request a waiver of an exclusion if an individual or entity is the sole community physician or the sole source of essential specialized services in a community (42 CFR 1001.1801(b)).

# EXHIBIT I

# Exhibit I to Defendants' Rule 26(a)(2) Expert Witness Disclosures

## <u>ATTENDING PHYSICIANS</u>

Malik S. Ali, M.D.
Family Medical Clinic
5434 West Capitol Drive
Milwaukee, WI 53216
(414) 875-0505

Rocco Ancieri II, M.D.
1010 Blymire Road
Dallastown, PA 17313
(717) 244-4531

Billy G. August, M.D.
Sacred Heart Medical Group
1715 North McKenzie Street
Foley, AL 36535
(251) 943-8515

Keith Bakke, M.D.
Aspen Medical Group-Maplewood Clinic
1850 Beam Avenue
Saint Paul, MN 55109
(651) 241-9500

Karim Baktiar, M.D.
1400 West Oklahoma Avenue
Milwaukee, WI 53215
(414) 384-2688

Matthew Beelen, M.D.
Lancaster General Hospital
555 North Duke Street
Lancaster, PA 17602
(717) 544-5511

[First Name Unknown] Bonyo, M.D.
[Address Unknown]

Domenick Brasile, D.O.
4402 Dexter Avenue
Erie, PA 16504
(814) 877-7100

[First Name Unknown] Carter, M.D.
[Address Unknown]

Stephen I. Chang, M.D.
Aurora Healthcare
Suite 200
15222 West National Avenue
New Berlin, WI 53151
(262) 754-2555

Janet T. Chua, M.D.
St. Catherine's Medical Center Clinic
9555 76th Street
Pleasant Prairie, WI 53158
(262) 577-8450

[First Name Unknown] Cohen, M.D.
[Address Unknown]

[First Name Unknown] Cook, M.D.
[Address Unknown]

Naju M. Dah, M.D.
2800 North California St., Ste. 17
Stockton, CA 95204
(209) 466-5888

Larry B. Dean, M.D.
Aurora Healthcare
3003 West Good Hope Road
Milwaukee, WI 53209
(414) 352-3100

Samuel Deutsch, M.D.
316 West Pike Street, Suite 100
Lawrenceville, GA 30045
(770) 682-8442

[First Name Unknown] Durant, M.D.
[Address Unknown]

[First Name Unknown] Fierer, M.D.
[Address Unknown]

Maribelle Gauna-Estrada, M.D.
406 Peach Street
Erie, PA 16507
(814) 480-7100

Stephen C. Goodwin, M.D.
Goodwin & Associates
31 Physicians Drive
Jackson, TN 30305
(731) 668-9791

Edward Gumm, M.D.
1275 S. Main Street, Suite 101
Greensburg, PA 15601
(724) 837-3111

Barbara Gutshall, M.D.
Avera O'Neill Family Medicine
403 East Hynes Avenue
Oneill, NE 68763
(402) 336-2622

Robert Hargraves, M.D.
121 Golfview Drive NE
Arab, AL 35016
(256) 586-1900

Bessie L. Hazard, M.D.
Fallon Clinic
630 Plantation Street
Worcester, MA 06105
(508) 595-2000

Daniel J. Hurley, M.D.
1600 Albany Street
Beech Grove, IN 46107
(317) 859-1090

Margaret B. Kush, M.D.
West Penn Internal Medicine Associates
Mellon Pavilion, Suite G25
4815 Liberty Avenue
Pittsburgh, PA 15224
(412) 621-1566

[First Name Unknown] Lewis, M.D.
[Address Unknown]

Jeff Ligon, M.D.
6141 Shallowford Road
Chattanooga, TN 37421
(423) 899-2700

[First Name Unknown] Manning, M.D.
[Address Unknown]

[First Name Unknown] Mcallister, M.D.
[Address Unknown]

Victor G. McGlaughlin, M.D.
405 Main Street
Landisville, PA 17538
(717) 898-2413

Shuaib Mohyuddin, M.D.
510 Recovery Road, Suite 201
Nashville, TN 37211
(615) 833-7080

[First Name Unknown] Ong, M.D.
[Address Unknown]

Major Reid, M.D.
Piedmont Physicians Group
4062 Peachtree Road NE, Suite C
Atlanta, GA 30319
(404) 231-4231

Mark Rohrer, M.D.
11 Nevins Street, Suite 401
Brighton, MA 02135
(617) 782-7788

[First Name Unknown] Rutland, M.D.
[Address Unknown]

[First Name Unknown] Sajawvey, M.D.
[Address Unknown]

[First Name Unknown] Sexson, M.D.
[Address Unknown]

Dennis A. Shannon III, M.D.
Centre Medical & Surgical Associates, PC
141 Medical Park Lane
Bellefonte, PA 16823
(814) 355-7322

Henry Shoenthal, M.D.
New Paris Rural Health Clinic
4186 Cortland Drive
New Paris, PA 15554
(814) 410-8300

Esmail Fallah Sohy, M.D.
Steward Health Care System
95 Chapel Street Suite 2A
Norwood, MA 02062
(781) 769-8769

[First Name Unknown] Tahir, M.D.
[Address Unknown]

[First Name Unknown] Tate, M.D.
[Address Unknown]

Barry Wentland, D.O.
1232 Greensprings Drive
York, PA 17402
(717) 741-2747

Kenneth F. Woerthwein M.D.
1575 Bannister Street, Suite 1
York, PA 17404
(717) 851-1405

Sally Ann Wooten, M.D.
300 Highland Avenue
Lewistown, PA 17044
(717) 242-7761

[First Name Unknown] Yousuf, M.D.
[Address Unknown]